1

2

3

4

5

6

7

8                               UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   THOMAS MAURICE JOHNSON,                          No.  2:21-cv-0971 KJM AC

12                  Petitioner,

13         v.                                         FINDINGS AND RECOMMENDATIONS

14   CONNIE GIPSON, Warden,

15                  Respondent.

16

17          Petitioner is a former California state prisoner proceeding pro se with an application for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the petition filed on

19   June 1, 2021, ECF No. 1, which challenges petitioner's 2018 conviction for kidnaping and related

20   offenses.  Respondent has answered, ECF No. 16, and petitioner has filed a traverse, ECF No. 24.

21                                       BACKGROUND

22   I.      Proceedings in the Trial Court

23          A.   Preliminary Proceedings

24          Petitioner was charged by criminal information in Butte County with kidnapping to

25   commit rape (Cal. Penal Code § 209(b)(1)) (Count 1); assault with intent to commit rape and/or

26   other sex offenses (§ 220(a)(1)) (Count 2); and resisting an executive officer (§ 69) (Count 3).  In

27   connection with Count 1, the information alleged that petitioner personally inflicted great bodily

28   injury on the victim within the meaning of Cal. Penal Code § 12022.7 (a).  In connection with

1

1    Count 2, the information alleged that petitioner inflicted great bodily injury on the victim during

2    the commission of an assault with the intent to commit rape, within the meaning of §12022.8.

3        B.  The Evidence Presented at Trial[1]

4            1.  Prosecution Case-in-Chief

5                a.  Jane Doe's Testimony

6        In 2016, Jane Doe was using pain medication, marijuana, and methamphetamine.  She had

7    been living that lifestyle for "about eight or nine years, on and off."  She acknowledged she had

8    been convicted of welfare fraud and was still on probation.  And she acknowledged that use of

9    methamphetamine was a violation of probation. On cross-examination, she acknowledged that

10   she had also been arrested in Texas.

11       On February 17, 2016, Jane Doe went for a walk.  She had consumed methamphetamine.

12   She went to Walgreens and to 7-Eleven on East Avenue to buy cigarettes and candy.  After she

13   exited 7-Eleven, she encountered petitioner.  Petitioner walked with Jane Doe briefly.  After three

14   to five minutes, the two parted ways.

15       Jane Doe later came to a bike path.  She testified that, as she was starting to cross the bike

16   path, petitioner suddenly grabbed her from behind "kind of in a neck hold" and pulled her onto

17   the bike path.  Jane Doe begged petitioner not to hurt her.  Petitioner told her to be quiet, and he

18   pulled her off onto the dirt to the side of the bike path.

19       Jane Doe tried to scream, but petitioner "was just too strong for" her.  She testified that

20   petitioner kept her from screaming "by pulling the scar tissue out of [her] neck and . . . making it

21   unable for [her] to talk."  Petitioner did that three or four times.  Jane Doe testified she "saw bits

22   and pieces of . . . [her] neck thrown onto the pavement."  She testified: "I was put to the pavement

23   a couple of times.  We were kind of in the dirt and on the bike path at the same time for maybe,

24   I'm not sure how long, but just for a short bit.  I lost consciousness many times, two or three

25   times . . . ."  When she lost consciousness, she was about six feet onto the bike path.

26

27   [1]  The following factual summary is adapted from the opinion of the California Court of Appeal,
     Lodged Doc. 22 at 4-15 (ECF No. 17-22 at 5-16).  The undersigned finds the summary to be
28   accurate, and its length necessary to discussion of the claims.

At some point, petitioner told Jane Doe to drop her pants. She tried to resist, but eventually complied because she was afraid petitioner was going to kill her. She testified she dropped her pants and then her head hit the pavement. She could not recall what happened after that.

### b.   911 Caller's Testimony

Stacy Morgan lived in a house that backed up to the bike path. Morgan heard a woman screaming, "He's going to rape me. Help. Help." After speaking to a 911 operator, Morgan looked outside and saw petitioner run towards her neighbor's yard, pulling his pants up. Petitioner jumped into Morgan's neighbor's yard. Morgan remembered talking to detectives later in the morning. She told them that she heard a female yell, "Rape, fire," twice.

### c.   Police Response and Investigation

At approximately 5:15 a.m., Sergeant Todd Lefkowitz of the Chico Police Department responded to the bike path. Lefkowitz described the location as just north of East Avenue. People's Exhibit 8, an aerial photograph, showed the bike path in the middle of the block running north and south between and parallel with White Avenue and Pillsbury Road, and running perpendicular to East Avenue, across the sidewalk and into a crosswalk across East Avenue. From East Avenue, Lefkowitz drove his vehicle onto the bike path at a 45-degree angle, facing northwest, unable to turn fully onto the bike path. He directed his spotlight down the bike path, where he saw a bicycle. After a few seconds, he saw petitioner with his pants down around his knees, jumping out from the shrubs east of the bike path onto the path approximately 50 to 75 feet Lefkowitz's vehicle. Only defendant's pants were down, not his underwear. Petitioner looked in Lefkowitz's direction and then turned and ran. Petitioner had difficulty running because his pants were around his knees. Petitioner attempted to mount the bike, but he fell. He tried to pull his pants up and get on the bike again, and when that failed, he ran and jumped over a backyard fence.

Lefkowitz backed his vehicle up, and then successfully turned completely onto the bike path. As he did so, he saw Jane Doe come out from the same location in the shrubs from which
////

1  petitioner had emerged.  She was very disheveled, covered in dirt and leaves, her face was

2  bloody, and her pants were down below her buttocks.

3        Meanwhile, Officer Richard Hartman, who was nearby in the area, saw petitioner.

4  Hartman warned petitioner that if he did not stop, Hartman would release his canine partner.

5  Petitioner ran and Hartman released the dog, Luna.  Luna apprehended petitioner who went to the

6  ground.  Hartman jumped on top of petitioner while another officer handcuffed him.  Petitioner

7  continued to struggle, and he bit Hartman's wrist.  After petitioner was detained, an officer

8  searched him and found an empty condom wrapper in his front pocket.  An officer who

9  subsequently collected swab samples from petitioner testified that his fingernails were "pretty

10  long."

11        Jane Doe was sent to the hospital in an ambulance.  She was in pain, she was frightened,

12  and she was having difficulty breathing because of her throat.  She was bleeding on the inside of

13  her neck and from where her head hit the pavement.

14        Officer Hartman spoke with Jane Doe at the hospital.  She told Hartman that prior to the

15  incident, she had gone to the Donut Nook, bought coffee and a donut, and left.  She did not tell

16  Hartman that she went to 7-Eleven or Walgreens.  Jane Doe told Hartman that at some point

17  during the first time she was with petitioner, he had reached his hand towards her groin.  Jane

18  Doe stopped petitioner's hand before he could touch her and told him that was "no way to treat a

19  woman."  However, in her direct examination, Jane Doe testified that there was no point before

20  the incident on the bike path when petitioner tried to touch any part of her body.

21        Officer Jamie McElhinney and her field training officer, Officer Travis Johnson, arrived at

22  the bike path.  McElhinney's role that morning was to survey and collect evidence.  On cross-

23  examination, McElhinney acknowledged that, as of the date of the incident, she had been on the

24  police force for approximately three weeks and this incident was the first time that she placed

25  evidence placards.  Officer Johnson supervised her while she was doing so.

26        On the sidewalk 10 to 15 feet to the west of the entrance to the bike path, McElhinney

27  located a bag containing a wallet and cigarettes.  (As petitioner established in the defense case-in-

28  chief, the wallet and cigarettes belonged to Jane Doe.)  People's Exhibit 29 depicted the bike path

as photographed from the sidewalk.  Six evidence placards could be seen in the near foreground

on and to the immediate east of the bike path.  A shoe was located approximately 20 feet from the

start of the bike path.  A second shoe was also located.  (The evidence did not establish whether

these were Jane Doe's shoes.)  The distance from the wallet, located on the sidewalk near the

entrance to the bike path, to the shoe located in foliage farther north along the bike path, was

approximately 47 feet.  McElhinney also measured drag marks "starting from around the same

area that the first items were located in the foliage to further down to where that last placard was

where [a] cable lock was located."  That distance was approximately 50 feet.  The total distance

"from the drag marks to the wallet and cigarettes" on the sidewalk was approximately 97 feet.

The drag marks themselves were approximately 50 feet.  The drag marks appeared in "the foliage

and the dirt area on the right-hand side of the bike path . . . ."  McElhinney testified that it

"appeared that a scuffle had occurred.  The foliage, dirt, rocks were disturbed in that area and not

any other areas that were noticeable.  Also, it was right in the area where the evidence items were

collected, such as the shoe."  McElhinney also located a belt in a backyard in the area where

petitioner was first contacted by law enforcement.  McElhinney testified that it "sound[ed] right"

that she told Detective Dane Gregory that Jane Doe was dragged approximately 150 feet based on

Jane Doe's statement and evidence observed at the scene.  However, McElhinney further testified

that that distance may have been an estimate, and that the actual measurements may have been

taken after Gregory left the scene.  Gregory testified that he agreed with the opinion of other

officers that Jane Doe was dragged 97 feet.

McElhinney acknowledged that none of the photographs in evidence showed drag marks.

#### d.  Medical and DNA Evidence

A nurse who performed a forensic medical examination of Jane Doe observed an abrasion

to Jane Doe's soft pallet towards the back of her mouth.  The injury was consistent with having

been inflicted by a fingernail.  Jane Doe also had abrasions to her tongue, and abrasions and

swelling to the back of her throat.

On cross-examination, defense counsel elicited from Jane Doe that she suffered from a

condition known as Barrett's esophagus.  Barrett's esophagus is a change to the lining of the

esophagus caused by significant reflux.  Jane Doe acknowledged that she had problems with her esophagus prior to this incident, but further testified that the issue did not result in problems in her throat.

A senior criminalist from the California Department of Justice testified that a DNA sample found underneath petitioner's left fingernails was from a female, and the profile matched the reference profile for Jane Doe.

2.  Defense Case

a.  Petitioner's Testimony

Petitioner testified that at approximately 3:00 a.m. the morning of the incident, he received a call from someone who wanted to purchase crystal methamphetamine and cocaine from him.  Petitioner left his apartment at 3:00 or 3:15 a.m. on his bike.  Petitioner rode his bike to the apartment of a female friend, C.J., who lived across the street from the location where he was going to meet his buyer.  His friend was not home, so he left.

Jane Doe approached petitioner on the street.  The two began to walk together, talking. They also smoked marijuana together.  At some point, petitioner went across the street to make a call.  He then retrieved his bike, and he and Jane Doe parted ways.  At that time, Jane Doe appeared to be under the influence of methamphetamine.

Petitioner's buyer did not show up.  Petitioner headed towards the bike trail, intending to go home.  He was on the sidewalk next to the bike trail when Jane Doe walked up to him.  She asked defendant if he had any more crystal methamphetamine.  She had seen that petitioner had methamphetamine when he took out the marijuana earlier.  Petitioner responded that he did, and Jane Doe asked to buy some.

Because it was close to 5:00 a.m. and there were people out going to work, petitioner wanted to move away from the sidewalk to give Jane Doe the methamphetamine. They walked about five or six feet from the sidewalk onto the dirt area adjacent to the bike trail.

The methamphetamine petitioner had was packaged in a plastic sandwich bag, the end of which he had burned so as to harden and seal it.  The substance itself was "like shards, like glass, like crystal shards . . . ."  Petitioner testified that "if you . . . would have squeezed it, the bag, it

6

1 would poke through the bag or you probably get a puncture wound because it's hard, it's like . . .

2 sharp pieces of glass."

3      Petitioner handed Jane Doe the baggie, containing approximately a gram and a half of

4 methamphetamine.  She gave him $5.  Petitioner testified that the methamphetamine he gave her

5 was "way too much for $5."  It was worth $30 to $40.  As petitioner tried to get the

6 methamphetamine back from Jane Doe, she "threw it in her mouth" and swallowed it.  Petitioner

7 put his fingers in Jane Doe's mouth, trying to force her to gag so that she would "spit it back up,"

8 which she did.  She then jumped on top of it on the ground and curled up in a fetal position.

9 Petitioner tried to move Jane Doe while the two of them were on the ground in an attempt to get

10 his methamphetamine, and the two tussled.  Jane Doe started screaming and hollering, and

11 defendant heard her yell "rape" and "fire."  Petitioner saw the methamphetamine and grabbed it.

12      Petitioner heard sirens approaching and saw a police officer in a vehicle coming towards

13 him.  He grabbed his bike and started trying to ride away.  The police officer stopped his vehicle,

14 jumped out, and yelled something.  Petitioner dropped his bike and jumped over a fence.  He did

15 not stop when ordered to do so by the officer because he had methamphetamine and cocaine on

16 him and he "didn't want to get arrested for them at the moment."  Petitioner testified, "I had real

17 baggy pants on," and explained "they wouldn't have been down to my knees or nothing like that,

18 but they were probably down a little bit past my waist."

19      When he dove over the fence, petitioner's belt got caught on the fence, and he "was

20 hanging there for a minute . . . ."  Eventually, he unfastened his belt, took it off, and got down

21 from the fence.  At this point the methamphetamine was in petitioner's hand and he had cocaine

22 in his pocket.  He also had a bottle of alcohol, a cigarette pack, and a condom in his pocket.  He

23 explained that when he carried drugs, he usually also carries a condom so that if the "police get

24 on" him, he can "throw [the drugs] up in the condom and just swallow it."  After petitioner got off

25 of the fence, he put the methamphetamine and cocaine in the condom, tied it off, and swallowed

26 it.

27      Petitioner saw police officers looking for him.  He stayed where he was for a long time,

28 until many of the officers left the area.  When he thought it was clear, he jumped over a fence into

a front yard.  Petitioner saw two officers and, when they were approximately 10 or 15 feet away from him, he ran again, but ran into a trash can and fell down.  One police officer pointed a gun at petitioner, and the other officer released his dog, which attacked petitioner.  The dog bit both of his legs.  Petitioner was then handcuffed by officers.  He stated that he did not intentionally bite an officer, but that the officer may have been bit when he put his arm over petitioner's face to try to make him stop yelling.

Petitioner testified that Jane Doe's account of what happened was not true.

### b.  Evidence from the Crime Scene

The defense called Detective Gregory, the lead detective on this case.  Gregory acknowledged that he collected cigarettes and a wallet from evidence and gave them back to Jane Doe "the next day."  Gregory also acknowledged that an item of evidence from the crime scene, a woman's shoe, appeared in two different photographs accompanied by two different evidence placards.  Gregory identified in photographs additional instances of the same item of evidence photographed with two different evidence placards and numbers.

### c.  Medical and Toxicological Evidence

Dr. Jennifer Ward treated Jane Doe at the hospital.  Dr. Ward testified that Jane Doe reported to her that "'a man put his hand in [her] throat and tried to rip [her] guts out.'"  She also claimed that the man tried to kill her.  Dr. Ward noted in her report that Jane Doe was "groggy appearing initially," and that she was "somewhat intoxicated."  The toxicology screen of Jane Doe's urine yielded positive results for "opiates . . . amphetamines, methamphetamine, benzodiazepine, and cannabinoids."

### d.  Dishonesty Character Evidence Regarding Jane Doe

Imogean Dodson (Imogean) met Jane Doe in 2001 at a "clean and sober living environment" and they were good friends.  Imogean was married to Jane Doe's former husband, Gerald Dodson (Gerald).  Imogean testified that, in 2016, Jane Doe came into their living room, without permission, when they were asleep and stole credit cards and an ATM card from Imogean's purse, as well as other items.  Imogean woke up to find Jane Doe "hovering over our bed."  Jane Doe asked Gerald for the keys to the Dodson's Escalade.  According to Imogean, Jane

Doe "believed that she was living there." Gerald took Jane Doe to "the Jesus Center," but Jane Doe returned to the Dodsons' house shortly thereafter. The Dodsons had to call the police to have Jane Doe removed from their house. Imogean opined that Jane Doe was not an honest and truthful person.

Officer Dan Wilson testified that in 2015, he arrested Jane Doe for shoplifting.

e. <u>Character Evidence Regarding Petitioner's Lack of Sexual Deviance</u>

Baljit Atwal, Ph.D., a clinical psychologist with a specialty in forensics, was retained by the defense to evaluate petitioner's general psychological functioning, his mental status, and his risk of sexual offending behavior. Dr. Atwal testified that on a sexual offending risk assessment test, petitioner "scored very low in being at risk to commit a sex offense, to commit either rape or child molestation or exhibitionism." She further testified that petitioner scored as a very low risk for "deviancy or characteristics of someone who would commit rape, violent sexual acts," and scored in the low risk range for violence and antisocial behavior. Dr. Atwal opined that peitioner did not have the characteristics of someone who would commit a violent sexual offense. She testified that there was nothing in his personal history or his test results to indicate sexual deviance. Dr. Atwal testified that petitioner was not a sexual predator.

Chassidy Walker, Cedar Hernandez, and Durell Siplin testified as character witnesses for petitioner. Walker had known defendant for approximately 15 years. Hernandez thought of petitioner as a brother. Siplin testified that petitioner was "a best friend of mine," "more like a brother," whom Siplin had known for approximately 20 years. All three witnesses testified that petitioner did not have a reputation in the community as someone who would kidnap a woman for the purpose of committing rape or assault a woman for the purpose of committing rape. Walker testified that petitioner's "character in the community is someone who is consistent and loving and caring, not a man that has been accused of these charges." Hernandez testified petitioner was a family man who worked mornings and stayed home the rest of the day to care for his family. Siplin testified that petitioner was "a dedicated father, . . . he's very committed to his family, and . . . he's very committed to his friends as well."

////

1

       3.  Prosecution Rebuttal

2

     Detective Kevin Hass testified that, in his experience as a narcotics officer, he never heard

3

of anyone getting a cut by touching a methamphetamine shard.  Hass acknowledged that crystal

4

methamphetamine looks like shards of glass.  He testified that it "appears like it's hard, but yet

5

you can break it."  Hass never heard of anyone getting any kind of injury from hiding

6

methamphetamine inside the mouth or in a body cavity.  And he had never seen a crystal

7

methamphetamine shard hard enough to puncture a plastic baggie.

8

     Detective Gregory testified that he prepared a search warrant for petitioner's Facebook

9

account.  He acknowledged stating in his affidavit to secure the warrant that Lefkowitz told him

10

that as he drove his patrol vehicle north onto the bicycle path, Lefkowitz had observed a black

11

adult male suspect on the ground with both his pants and his underwear pulled down to his knees.

12

With regard to Jane Doe, Gregory stated in the affidavit that she told him she had left the Donut

13

Nook and thereafter ran into petitioner.  Gregory did not recall Jane Doe saying anything about 7-

14

Eleven or Walgreens.  Gregory acknowledged that nowhere in the affidavit did he indicate that

15

Jane Doe was dragged during the encounter at the bike trail.  The affidavit also indicated that,

16

according to Jane Doe, petitioner pulled her pants down rather than that she pulled her pants

17

down as ordered by petitioner.  Gregory acknowledged that, in his affidavit, he stated that there

18

were six different Facebook messages exchanged between petitioner and C.J. over a span of time

19

leading up to the alleged incident.  However, he further acknowledged that there were actually

20

only two messages exchanged between them over that time.

21

       4.  Stipulation re Jane Doe's Prior Testimony

22

    The parties stipulated as follows:

23

24

          At the defendant's preliminary hearing . . . Jane Doe testified under
oath that on February 17th, 2016, she stopped at a donut store.

25

26

          At the defendant's preliminary hearing . . . Jane Doe testified under
oath that on February 17th, 2016, the defendant . . . tried to remove
her pants.

27

28

          Three, at the defendant's preliminary hearing . . . Jane Doe testified
under oath that other than her conviction for welfare fraud, she had
no other convictions.

1
2

Four, at the defendant's preliminary hearing . . . Jane Doe testified under oath that other than her arrest for welfare fraud, she had never been arrested.

3
4

Five, at the defendant's preliminary hearing . . . Jane Doe testified under oath that she did not go into 7-Eleven on February 17th, 2016.

5

C.   Outcome

6

On Count 1, the jury found petitioner not guilty of kidnapping to commit rape, but guilty

7

of the lesser included offenses of simple kidnapping and felony false imprisonment.[2]  On Count 2,

8

the jury found petitioner not guilty of assault with intent to commit rape, but guilty of the lesser

9

included offense of simple assault.  Petitioner was found guilty on Count 3, resisting an executive

10

officer.  The jury further found true the great bodily injury enhancement allegations related to the

11

simple kidnapping and felony false imprisonment convictions.  The trial court sentenced

12

petitioner to an aggregate term of 11 years eight months.

13

II.      Post-Conviction Proceedings

14

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of

15

conviction on December 29, 2020.  Lodged Doc. 22 (ECF No. 17-22).  The California Supreme

16

Court subsequently denied review.  Lodged Doc. 24 (ECF No. 17-24).

17

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

18

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

19

1996 ("AEDPA"), provides in relevant part as follows:

20
21
22

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

23
24

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

25
26

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

27

28

[2]  On appeal, the conviction for false imprisonment was set aside, because it is a necessarily lesser included offense of kidnaping.  See Lodged Doc. 22 at 16-17 (ECF No. 17-22 at 17-18).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims

1 summarily, without a reasoned opinion.  In <u>Richter</u>, <u>supra</u>, the Supreme Court held that when a

2 state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

3 must determine what arguments or theories may have supported the state court's decision, and

4 subject those arguments or theories to § 2254(d) scrutiny.  <u>Richter</u>, 562 U.S. at 102.

5 DISCUSSION

6 I.      <u>Claims One and Two: Prosecutorial Misconduct and Ineffective Assistance of Counsel</u>

7 A.  <u>Petitioner's Allegations and Pertinent State Court Record</u>

8 Petitioner alleges in Claim One that the prosecutor committed misconduct, in violation of

9 petitioner's due process rights, by making improper remarks in closing argument regarding (1) a

10 search warrant affidavit, (2) the voluntariness of the victim's testimony, and (3) the possibility of

11 other victims.  Defense counsel did not object to any of these statements, and petitioner alleges in

12 Claim Two that the failure to object constitutes ineffective assistance of counsel in violation of

13 his Sixth Amendment rights.  The two claims are addressed together here because they are so

14 closely intertwined.

15 The pertinent trial court record was summarized as follows by the California Court of

16 Appeal:[3]

17 **Remarks Regarding Search Warrant Affidavit**

18 As noted, Gregory obtained a search warrant looking for
communications between defendant and C.J., the female friend
19 defendant went to visit before the incident underlying the charged
offenses. In the defense closing argument, trial counsel pointed out
20 that Gregory stated in his affidavit that defendant's pants and
underwear were all the way down. Counsel argued this was
21 "completely false," as demonstrated by Lefkowitz's trial testimony.
Counsel further argued: "How is it that this man and this detective
22 used his powers to get a search warrant, convince the judge to do so
by telling information that was false? We know that it's false
23 because we heard Officer Lefkowitz testify. So when he signed that
affidavit, it was false." Counsel also emphasized that Gregory
24 claimed in his affidavit that there were six different Facebook
messages between defendant and C.J. during the relevant time, but,
25 according to the evidence produced at trial, there were only two.
Counsel posed a question; how could Gregory offer information in
26 his affidavit seeking a search warrant that was wrong? Counsel then
furnished his own answer: "They're liars."

27

28 [3]  The undersigned finds this summary to be accurate.

13

In his rebuttal closing argument, the prosecutor told the jury: "There was some discussion about the search warrants somehow containing false information. Ladies and Gentlemen, if a search warrant is containing false information, and the probable cause is not there because of the officer's lied [sic] or were incredible sloppy, [sic] the evidence gets suppressed." (Italics added.) Defendant's trial counsel objected and requested a sidebar, asserting that it was inappropriate for the prosecutor to say that the defense could have had the evidence suppressed. However, counsel did not provide a legal reason for why the argument was improper. Nor did counsel request a curative instruction. The court overruled the objection, ruling that the remark was fair comment "to the inferencethat [the defense] raised in [its] closing argument, and the search warrant was likely insufficient, and the officer lied in obtaining it."

**Remarks Regarding the Voluntariness of Jane Doe's Testimony**

In his closing argument, trial counsel noted that a criminal defendant has every right not to testify. He stated of defendant: "He didn't have to get up there and talk to you. Not only did he get up there and talk to you, he came and physically showed you what happened between him and the police."

The prosecutor in rebuttal stated: "a moment ago [trial counsel] pointed out that [defendant] didn't have to talk to you, didn't have to come and tell his story. That's absolutely true. But neither did Jane Doe. She didn't have to come and testify. We can't throw her in jail if she refuses. So she came here and had the courage to sit on the stand and look at you and tell you her story." (Italics added.) No objection was made to these remarks.

**Remarks Raising the Possibility of Other Victims**

During redirect examination, Dr. Atwal described sexual predation. She stated: "Sexual predation is being a sexual predator. So, for example, Harvey Weinstein has been in the news. So there's all of these individuals that are coming out saying that he exploited them sexually. So multiple victims over the span of a long period of time is a definition of a sexual predator." During his recross-examination, the prosecutor asked Dr. Atwal, "Harvey Weinstein got away with it for some 30 years, didn't he?" [fn. omitted.]

In an apparent effort to address Dr. Atwal's testimony that defendant showed no signs of sexual predation, the prosecutor sought to present testimony by Gregory in rebuttal eliciting that in the course of his work, he found that in some cases, the accused's family and friends had no idea about the acts the accused had committed. The court conducted an Evidence Code section 402 hearing and ultimately precluded the evidence on Evidence Code section 352 grounds.

In closing argument, defendant's trial counsel contrasted this case with Harvey Weinstein's, stating, "in [Weinstein's] case there's over 40 people now that have come out, and you know what it is?

Everybody knew." Counsel continued: "Now, that means that their theory saying that oh, no other sex cases, that friends and family do not know about it. How is it that this man has no red flags? They want you to believe that he goes from 0 to 60 just like that because he had a little bit of alcohol in him, because his wife just had a baby, and because he couldn't have sex with [C.J.]. So then he just went and turned into a violent rapist, kidnapper and rapist. No precursors for that. No other allegations ever made. Nobody in his family or friends ever would think that he did it. [¶] They want you to believe that he's a violent rapist when he has nothing in his history that would indicate anything of the sort. And then he's suggesting well, the only way we would know, is if he had been arrested or charged before. So we don't know, but we do know. We do know because you heard everything about [defendant]. [¶] You don't think if he had any incidents before, sexual or violent or otherwise you would have heard about it? Of course you would have, but there isn't."

In his rebuttal argument, the prosecutor responded to Dr. Atwal's testimony about sexual predators having a pattern and trial counsel's closing argument. He stated: "They groom people. Just because there haven't been any identified or come forward or there's been no other arrests or prosecutions, doesn't mean there's not more victims out there. It's possible that we just haven't found them yet. We know this from Dr. Atwal's – when Dr. Atwal talked about Harvey Weinstein, we know this from Jerry Sandusty. [sic] We know about this from Bill Cosby, everyone. There's some of their closest friend [sic] are shocked when they discover what these people are capable of." (Italics added.) Defendant's trial counsel did not object to these remarks.

Lodged Doc. 22 at 46-49 (ECF No. 17-22 at 47-50.

       B.  <u>The Clearly Established Federal Law</u>

Erroneous or offensive statements by a prosecutor violate a criminal defendant's constitutional rights only where "the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (internal quotations omitted).  This must be evaluated in the context of the trial record as a whole.  <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).  "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>Greer v. Miller</u>, 483 U.S. 756, 765 (1987).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982).  "[I]t ////

15

1   is not enough that the prosecutor's remarks were undesirable or even universally condemned."

2   Darden, 477 U.S. at 181.

3          To establish a constitutional violation based on ineffective assistance of counsel, a

4   petitioner must show (1) that counsel's representation fell below an objective standard of

5   reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

6   Washington, 466 U.S. 668, 692, 694 (1984).  Prejudice means that the error actually had an

7   adverse effect on the defense.  There must be a reasonable probability that, but for counsel's

8   errors, the result of the proceeding would have been different.  Id. at 693-94.  The court need not

9   address both prongs of the Strickland test if the petitioner's showing is insufficient as to one

10  prong.  Id. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of

11  sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

12          C.  The State Court's Ruling

13         Claims One and Two, like all claims in the federal petition, were raised on direct appeal.

14  Because the California Supreme Court denied discretionary review, the opinion of the California

15  Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas

16  review in this court.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d

17  1026, 1034 (9th Cir. 2012).

18         The California Court of Appeal ruled in pertinent part as follows:

19             "The standards governing review of misconduct claims are settled.
20             'A prosecutor who uses deceptive or reprehensible methods to
               persuade the jury commits misconduct, and such actions require
21             reversal under the federal Constitution when they infect the trial
               with such " 'unfairness as to make the resulting conviction a denial
22             of due process.' " [Citations.] Under state law, a prosecutor who
               uses such methods commits misconduct even when those actions do
23             not result in a fundamentally unfair trial.' " (People v. Parson
               (2008) 44 Cal.4th 332, 359; see also People v. Centeno (2014) 60
24             Cal.4th 659, 674.)

25             …

26             Defendant's trial attorneys did not object to the prosecutor's
               rebuttal argument indicating that they could not "throw [Jane Doe]
27             in jail" if she refused to testify and raising the possibility that
               defendant had other, unknown sexual assault victims. As such,
28             defendant forfeited any claims of prosecutorial misconduct in

connection with these arguments. (*Dykes, supra*, 46 Cal.4th at p. 757; *Stanley, supra*, 39 Cal.4th at p. 952.)

With regard to the prosecutor's discussion about the search warrant affidavit, trial counsel objected and argued to the trial court that the prosecutor's remark was "a completely inappropriate comment for him to say that we could have, and it could have been suppressed. [¶] First of all, we got that document the day before. It was the last discovery we have, and I'm just -- clearly, I mean, there's -- it's an improper argument." Trial counsel did not give a specific legal reason why the comment was inappropriate or improper. "Counsel has an obligation to state the 'specific ground for an objection in order to preserve the issue for appeal.' " (*People v. Reyes* (2016) 246 Cal.App.4th 62, 77, quoting *People v. Thomas* (2012) 54 Cal.4th 908, 938 & citing *Stanley, supra*, 39 Cal.4th at p. 952.) By merely objecting on the grounds of "inappropriate comment" and "improper argument," defendant forfeited the particular arguments he makes on appeal. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 560-561 [the defendant appropriately concedes that, "by objecting only one time each on the vague ground of 'improper argument' during the prosecutor's initial and rebuttal closing arguments," he forfeited his claim of prosecutorial misconduct].)

…

### Ineffective Assistance of Counsel

Defendant asserts that, to the extent that his prosecutorial misconduct claims are forfeited, he was denied the constitutionally effective assistance of counsel. We conclude defendant has failed to satisfy his burden of proof.

**1. Remarks Regarding Search Warrant Affidavit**

**a. Deficient Performance**

The Attorney General asserts that the prosecutor's "brief comment about the search warrant was proper." The Attorney General asserts that the comment was directly responsive to defense arguments, and referenced the "commonly understood idea that defendants have various legal options to challenge the veracity of police conduct."

In arguing to the jury that, "if a search warrant is containing false information, and the probable cause is not there because of the officer's lied [sic] or were incredible sloppy, [sic] the evidence gets suppressed," the prosecutor improperly argued facts not in evidence. There was nothing before the jury concerning the circumstances under which evidence will be suppressed. It is true that " '[c]ounsel may argue facts not in evidence that are common knowledge or drawn from common experiences.' " (*People v. Mendoza* (2016) 62 Cal.4th 856, 908, quoting *People v. Young* (2005) 34 Cal.4th 1149, 1197; accord, *Hill, supra*, 17 Cal.4th at p. 819.) But as our high court recently observed, " '[F]acts are deemed within the common knowledge of the jury only if they are matters of common human experience or well known laws of natural

science.' " (*People v. Rodriguez* (May 21, 2020, S251706) ___ Cal.5th ___, ___ [2020 Cal. Lexis 3152, *11-12; 2020 WL 2563833, *4] (*Rodriguez*), quoting *People v. Love* (1961) 56 Cal.2d 720, 732, disapproved on another ground in People v. Morse (1964) 60 Cal.2d 631, 637, fn. 2 & citing *People v. Davis* (2013) 57 Cal.4th 353, 360.) [fn. omitted.] The standards applicable to traversing search warrants and the circumstances under which evidence will be suppressed are not matters commonly known by lay jurors. Indeed, it can be argued that the movies, television and the media often misstate the law on such matters as the suppression of evidence in criminal cases.

Moreover, the prosecutor's statement – "if a search warrant is containing false information, and the probable cause is not there because of the officer's lied [sic] or were incredible sloppy, [sic] the evidence gets suppressed" – suggested that a court had already reviewed the matter and because the jury heard evidence from defendant's Facebook account that was the fruit of the search warrant, a judge had already determined Gregory's veracity.

Beyond the record lacking evidence explaining the process for traversing search warrants and the judicial determination as to Gregory's veracity implied by the prosecutor, the prosecutor's statement was also misleading on the law. "A defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. The trial court must conduct an evidentiary hearing only if a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. Innocent or negligent misrepresentations will not support a motion to traverse." (*People v. Scott* (2011) 52 Cal.4th 452, 484 (*Scott*), citing *Franks v. Delaware* (1978) 438 U.S. 154, 154-156 [57 L.Ed.2d 667] & *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 988-989.) "[T]he defendant must make his showing by a preponderance of the evidence, and the affidavit is presumed valid." (*Scott*, at p. 484.) In other words, no evidence is suppressed if misrepresentations are innocent or negligent. Nor is evidence suppressed if the warrant can be corrected to omit intentionally false information and probable cause remains. While the prosecutor briefly mentioned "and the probable cause is not there," his comment was misleading as to the "correct and retest" mechanism in the law. Even if there had been a motion to traverse, a trial court could have found Gregory lied and still not suppressed the evidence. Indeed, it does not appear that whether both the defendant's pants and underwear were down when he came out of the bushes was material enough to have vitiated the probable cause for the warrant. Indeed, under such circumstances a defendant may opt not to move to traverse a warrant and as a consequence, there would have been no pretrial determination about Gregory's veracity by the trial court whatsoever.

Thus, the prosecutor's statement both argued facts not in evidence and was a misleading on the law. We conclude that there appears to

18

be no satisfactory explanation for counsel's failure to register these specific objections or to request an admonition. (*See Ledesma, supra*, 43 Cal.3d at p. 218.) Therefore, we conclude that defendant's trial attorneys' performance was deficient for failure to

register a specific objection on these grounds to the prosecutor's statement and request an admonition.

**b. Prejudice**

We conclude, however, that defendant was not prejudiced as a result of his attorneys' deficient performance in this regard.

The remark was isolated and had little relevance to any issue the jury was required to resolve. The trial court instructed the jury that the attorneys' remarks are not evidence (CALCRIM Nos. 104, 222), and that the jury alone must judge the credibility of the witnesses (CALCRIM Nos. 105, 226). "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

Moreover, the jury's verdict on the charged sex offense further shows the prosecutor's comment did not prejudice defendant. The credibility contest here was between Jane Doe and defendant. Gregory's testimony had no impact. The jury rejected the sex offenses, so whether defendant was seen with both his pants and underwear down turned out to be of no consequence. Indeed, Lefkowitz told the jury defendant's underwear was not down. In the end, the jury returned an assault verdict that was consistent with defendant's own testimony and reflected a rejection of the prosecution's central theory. And as we have noted, the kidnapping and false imprisonment convictions were supported by Lefkowitz's testimony concerning where he saw defendant and Jane Doe emerge from the bushes relative to the street and her condition at the time.

We conclude that defendant has not shown there is a reasonable probability he would have received a more favorable result had trial counsel provided specific objections to the prosecutor's improper remarks. (*Strickland, supra*, 466 U.S. at pp. 693- 694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) Therefore, defendant has failed to show prejudice.

**2. Remarks Regarding the Voluntariness of Jane Doe Testimony**

**a. Deficient Performance**

In rebuttal, the prosecutor argued: "a moment ago [trial counsel] pointed out that [defendant] didn't have to talk to you, didn't have to come and tell his story. That's absolutely true. But neither did Jane Doe. *She didn't have to come and testify. We can't throw her in jail if she refuses. So she came here and had the courage to sit on the stand and look at you and tell you her story."* (Italics added.)

This statement argues facts not in evidence. There is no evidence indicating whether Jane Doe appeared pursuant to a subpoena compelling her appearance or whether she appeared voluntarily. Nor is there evidence indicating Jane Doe knew she had a choice not to testify. And there was no evidence in the record indicating the prosecutor could not "throw her in jail" if she refused to appear or testify. To be sure, Code of Civil Procedure section 1219, subdivision (a), shields sexual assault victims from contempt for refusing to testify. [fn. omitted.]  But that provision in law is beyond common knowledge.

The prosecutor's argument was clearly improper. And there appears to be no satisfactory explanation for counsel's failure to object. (*See Ledesma, supra*, 43 Cal.3d at p. 218.) Trial counsels' performance in failing to object to the remark was deficient.

The Attorney General asserts that the remarks addressed by the prosecutor were directly responsive to trial counsel's closing argument, in which he "lauded [defendant] for taking the stand." The Attorney General asserts that the prosecutor merely reminded the jury that, to the extent that defendant deserved credit for his willingness to testify, so too did Jane Doe. To an extent this is true. However, the prosecutor exceeded merely responding, permissibly, to trial counsel's argument by arguing facts not in evidence.

**b. Prejudice**

Defendant has failed to establish prejudice. To say that it took courage to testify is both a fair comment on the evidence and a statement of the obvious. The fleeting comment concerning the prosecutor's inability to compel Jane Doe's testimony was inconsequential. It is not reasonably probable that, had trial counsel objected, defendant would have achieved a more favorable result.

Defendant emphasizes the concerns regarding Jane Doe's credibility, including her criminal history and her denial of part of that history, her drug use, and evidence relevant to her character for dishonesty offered by Imogean. Defendant maintains that the prosecutor's remark, and indeed each of his remarks cited by defendant, shored up Jane Doe's otherwise questionable credibility. The Attorney General responds that trial counsel cross-examined Jane Doe extensively on her criminal history, drug use, and prior inconsistent statements. The defense also presented evidence addressed to Jane Doe's credibility and honesty. We are of the opinion that the prosecutor's remark did not significantly impact Jane Doe's credibility. Again, even with the prosecutor's improper remarks, the jury's verdicts indicated it rejected much of Jane Doe's testimony. Instead, it returned verdicts that are consistent with defendant's own testimony and other evidence the jury heard.

Defendant has failed to establish there is a reasonable probability he would have received a more favorable result had trial counsel objected to the prosecutor's improper argument. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

20

### 3. Remarks Suggesting Defendant Had Other Victims

### a. Deficient Performance

The third instance of prosecutorial misconduct is the most disturbing. In rebuttal, the prosecutor argued: "They groom people. Just because there haven't been any identified or come forward or there's been no other arrests or prosecutions, *doesn't mean there's not more victims out there. It's possible that we just haven't found them yet.* We know this from Dr. Atwal's -- when Dr. Atwal talked about Harvey Weinstein, we know this from Jerry Sandusty. [sic] We know about this from Bill Cosby, everyone. There's some of their closest friend [sic] are shocked when they discover what these people are capable of." (Italics added.)

In *Fuiava, supra*, 53 Cal.4th 622, upon which defendant relies, our high court concluded a number of prosecutorial misconduct claims were forfeited. (*Id.* at pp. 726-729.) But the court went on to say: "we take this opportunity to comment on an aspect of the prosecutor's penalty phase closing argument that, although forfeited as a basis for reversal on appeal, warrants condemnation. In two instances the prosecutor improperly suggested to the jury that it speculate regarding aspects of defendant's violent criminal history that were not presented at the trial—by describing defendant as a 'killing machine' (although there was no evidence that defendant had killed anyone other than Deputy Blair), and then, with regard to defendant's victims, asking that the jury speculate 'How many others are there?' " (*Id.* at pp. 728-729, italics added.) "Certainly a prosecutor should not invite the jury to speculate . . . ." (*People v. Yeoman* (2003) 31 Cal.4th 93, 149.)

There was no evidence presented at trial about other victims. But the prosecutor's comment implied facts not in evidence and invited the jury to speculate that defendant might have committed other acts of sexual misconduct for which he was not apprehended. In short, the prosecutor invited the jury to speculate that defendant was a sexual predator in a league with Harvey Weinstein, Jerry Sandusky, or Bill Cosby.

" 'While counsel is accorded "great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation]," counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence.' " (*People v. Collins* (2010) 49 Cal.4th 175, 209, quoting *People v. Valdez* (2004) 32 Cal.4th 73, 133-134.) The remarks amounted to a sort of burden shifting, imposing on defendant the burden of proving that there were not other victims out there. [fn. omitted.]

We consider these remarks to be highly improper and, like our high court in *Fuiava*, we condemn such arguments. And we discern no satisfactory explanation for counsel's failure to object. (*See Ledesma, supra*, 43 Cal.3d at p. 218.) Accordingly, we conclude that defendant's trial counsel's performance was deficient for failing to object to these remarks.

1    **b. Prejudice**

2    The remarks at issue, as improper as they were, were addressed
3    solely to the sex assault theory of the case. The jury rejected the
     prosecution's theory that defendant committed the offenses for the
     purpose of raping Jane Doe, and instead returned verdicts that were
4    consistent with defendant's testimony about retrieving his
     methamphetamine and other evidence not related to the
5    prosecutor's improper comment. We conclude there is not a
     reasonable probability that defendant would have received a more
6    favorable result had trial counsel's performance not been deficient
     in failing to object to these obviously improper remarks.
7    (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43
     Cal.3d at pp. 217-218.)

8

9    Lodged Doc. 22 at 49-59 (ECF No. 17-22 at 50-60).

10        D.   Objective Reasonableness Under § 2254(d)

11            1.   Preliminary Considerations: Procedural Default

12        Respondent contends that the state court's forfeiture finding under California law creates a

13   procedural bar to the consideration of the prosecutorial misconduct claims in this court.  ECF No.

14   16 at 23.  As a general rule, a federal habeas court will not review a question of federal law

15   decided by a state court if the decision of that court rests on a state law ground that is independent

16   of the federal question and adequate to support the judgment.  Coleman v. Thompson, 501 U.S.

17   722, 729 (1991).  A petitioner can overcome a procedural default by demonstrating cause and

18   prejudice.  Id. at 753.  Ineffective assistance of counsel in causing the default may constitute

19   cause, when such ineffectiveness is independently pleaded and exhausted.  Murray v. Carrier, 477

20   U.S. 478, 488 (1986); Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  Both to overcome default

21   and to support relief on his IAC claims, petitioner must establish that counsel performed

22   unreasonably and that he was prejudiced by the defective performance.  See Strickland, supra,

23   466 U.S. at 694.  In this case, that inquiry necessarily requires analysis of the prosecutor's

24   statements and their effects, if any, on the verdict.

25        A federal court may bypass consideration of a procedural bar issue in the interests of

26   judicial economy, where the asserted default presents complicated questions and the other issues

27   are resolvable against the petitioner.  Lambrix v. Singletary, 520 U.S. 518, 522-25 (1997);

28   Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).  Here, because the merits of the

1  defaulted issues must be evaluated in any case, and because the default issue would be

2  excessively time-consuming to address separately, the undersigned exercises discretion to bypass

3  the procedural default issue and proceed to the merits.

4        2.  The State Court Reasonably Found That Petitioner Was Not Prejudiced by

5             Counsel's Failure to Object to Improper Prosecutorial Statements

6        In addressing petitioner's assertion of ineffective assistance of counsel, offered in the

7  California Court of Appeal to overcome forfeiture of the prosecutorial misconduct issues under

8  California law, the state court found (1) that the prosecutor's statements were improper; (2) that

9  defense counsel performed deficiently in failing to object; and (3) that petitioner had not been

10  prejudiced because the prosecutor's comments, evaluated in light of the trial record as a whole,

11  can have had no likely effect on the jury's verdict.  Unless the latter conclusion constituted an

12  unreasonable application of clearly established federal law, there is no avenue available to

13  plaintiff for federal habeas relief on either Claim One or Claim Two.  See Strickland, 466 U.S. at

14  697 (absent showing of prejudice from deficient representation, relief is unavailable regardless of

15  counsel's performance); Darden, 477 U.S. at 181 (absent fundamental fairness of trial as a whole,

16  relief is unavailable regardless of prosecutor's offensiveness or extent of legal error).

17        The appellate court's analysis of Strickland prejudice was not objectively unreasonable.

18  As to the prosecutor's comment about the search warrant affidavit, this did not relate to a

19  significant issue in the case and it was therefore perfectly reasonable for the state court to find

20  that it had no likely effect on the jury.  The credibility of Jane Doe's testimony was much more

21  central to the case, but the jury was presented with so many reasons to question her credibility

22  (criminal history, chronic drug use, drug intoxication at the time of the charged events,

23  inconsistent statements, facially incredible statements, and testimony about her character for

24  untruthfulness), and the verdict so clearly reflects that the jury evaluated her testimony critically,

25  that it was reasonable for the state court to find a lack of prejudice.  And as to the indisputably

26  inflammatory statements regarding high profile sexual predators and unknown additional victims,

27  in a case with no conceivable relationship to serial sexual predation —let alone serial sexual

28  predation enabled by money, fame and power, as suggested by the references to Weinstein, Cosby

1    and Sandusky—the jury's rejection of the prosecution's attempted rape theory compels a finding

2    that the statements did not prejudice petitioner.  For all these reasons, the state court's prejudice

3    analysis cannot have constituted an unreasonable application of <u>Strickland</u>.

4          This conclusion forecloses relief on both Claim One and Claim Two.  It follows from the

5    conclusion that counsel's failure to object did not have an outcome determinative effect on the

6    trial that the jury's exposure to the statements, with or without an instruction to disregard, did not

7    have an outcome determinative effect on the trial.  Accordingly, for the same reasons explained

8    by the state court in the <u>Strickland</u> context, the prosecutor's improper statements did not render

9    the trial as a whole fundamentally unfair as a matter of due process.  The undersigned gives

10   particular weight in this context to the fact that the jury rejected the prosecution's attempted rape

11   theory.  The case was intensely litigated both pretrial and before the jury, and a vigorous defense

12   was presented.  The jury had the opportunity to observe both Jane Doe and petitioner on the

13   witness stand, and to consider substantial impeachment evidence as to Jane Doe and exculpatory

14   character evidence as to petitioner.  The jury was properly instructed as to all applicable law.[4]

15   Under any standard of review, petitioner cannot prevail on his prosecutorial misconduct claim

16   absent a showing of fundamental unfairness, and petitioner cannot satisfy that high standard on

17   this record.

18   II.   <u>Claim Three: Exclusion of Defense Expert Witness Williams</u>

19       A.   <u>Petitioner's Allegations and Pertinent State Court Record</u>

20         Petitioner contends that his rights were violated by the trial court's exclusion of proffered

21   expert testimony regarding the crime scene investigation.

22         The California Court of Appeal summarized the pertinent trial court record as follows:[5]

23           Defendant's trial counsel indicated his intent to call Tim Williams,
     a former Los Angeles Police Department detective and "police
24   procedure expert," to offer his opinion on "the investigation, the
     crime scene, the manner in which evidence was collected and
25   preserved." He would also "testify about proper investigation and
     crime scene techniques, analysis of the evidence as how this
26   investigation was conducted." According to counsel, Williams had

27    

     _____
28   [4]  Petitioner has raised no claims of instructional error in any court.
     [5]  The undersigned finds this summary to be accurate.

testified "at least a hundred times" concerning, among other things, police procedure.

The prosecutor opposed Williams's proposed testimony, asserting that there had "been no allegations . . . that there's been any kind of issues with evidence tampering or contamination. There's no evidence that any particular items of evidence weren't collected."

The court noted that defendant, who had testified, "put himself at the crime scene." The court continued: "There's been very little evidence collected. He's admitted to putting his hand in the alleged victim's mouth. One of the pieces of evidence is the DNA under the fingernail. And these are areas . . . that are not . . . outside the province of the jury to determine such that expert testimony is needed to assist them in their deliberations. [¶] And so that will be the Court's ruling."

When it became clear to defendant's trial counsel that the trial court had precluded Williams's testimony in all areas, he requested an Evidence Code section 402 hearing. The trial court responded that it "ha[d] ruled." Counsel replied: "Mr. Williams and I have marked more than 20 photos. These were photos taken . . . during their investigation. These are photographs, and he is an expert in evidence collection, he is an expert and testified multiple times in evidence collection preservation, whether or not it is preserved properly, how it is collected. [¶] We have photos of people that we intend to use with him where they are using with their hand, touching pieces of evidence, which is directly in conflict with Officer McElhinney's testimony. There are different photos of same pieces of evidence with different photo markers. Multiple, multiple problems with this crime scene. They have not been presented to this jury. But the two photographs that have been presented to the jury by the district attorney, . . . one of them has a photo marker 40, one of them has a photo marker 3. They are the exact same piece of evidence and they have not been presented as such to the jury. Mr. Williams has analyzed and looked over every picture that was taken in this case, every procedure, every report, everything with regard to how the evidence was collected, preserved, maintained, tested, what wasn't collected, how it wasn't collected, and proper police procedure in this type of a rape case. He is an expert witness in criminal procedure, crime scene investigation, and he has done this and testified not only for the defense, mostly for the prosecution in this regard." Additionally, counsel argued that McElhinney testified there were drag marks at the crime scene, but drag marks did not appear in the photographs introduced at trial. McElhinney's testimony was that the drag marks appeared in other photographs, but those photographs were not shown at trial. According to counsel, Williams looked at "every photograph" and he would opine that there was "no evidence from any of the photographs of the crime scene or the evidence collected from [Jane Doe] that would indicate that she was dragged at all." Trial counsel suggested that the court conduct a hearing to consider Williams's expertise, and continued: "this is an evidence scene that is contaminated, it is untrustworthy, and the jury should be able to not only see the entire crime scene as it was actually that evening, but how the photo

marker -- or the evidence markers were moved, removed, and changed. And that it is improper police procedure and it is absolutely proper for us to put up an expert to testify in that regard." Counsel stated that presenting expert opinion evidence concerning "shoddy police investigations," improper evidence collection, and crime scene errors is something that is neither novel nor uncommon.

The court was not persuaded by counsel's arguments and ruled: "given the evidence that we have, the Court does not see that there's relevance to the line of inquiry." The court returned to the fact that defendant "admitted to being there and putting his hand inside of the victim's mouth," and noted that the photographs and evidence placards were not shown to the jury.

Lodged Doc. 22 at 29-31 (ECF No. 17-22 at 30-32).

### B. The Clearly Established Federal Law

The Constitution guarantees criminal defendants the right to present witnesses, and to compel their attendance if necessary. Chambers v. Mississippi, 410 U.S. 284, 302 (1973); Washington v. Texas, 388 U.S. 14, 19 (1967). The Compulsory Process Clause is one source of the more general Sixth Amendment right of a criminal defendant to present a complete defense. Crane v. Kentucky, 476 U.S. 683, 690 (1986). A defendant's right to present witnesses may be limited to accommodate other legitimate interests in the criminal trial process. Chambers, 410 U.S. at 295. State rules limiting the admissibility of defense evidence are constitutionally permissible as long as they are rationally related to the legitimate purpose of excluding evidence that has only a weak logical connection to the central issues at trial. Holmes v. South Carolina, 547 U.S. 319, 326-330 (2006).

### C. The State Court's Ruling

The state court evaluated this issue exclusively under California law governing the admission of expert testimony, finding the constitutional dimension of the issue forfeited. See Lodged Doc. 22 at 32-33 (state law standards applied), 36-37 (forfeiture) (ECF No. 17-22 at 33-34, 37-38). The court analyzed the claim as follows:

We conclude that the trial court abused its discretion in precluding Williams's testimony relative to the drag marks.

There was no assertion or determination that Williams lacked " ' "special knowledge, skill, experience, training, or education" in a

26

particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion.' " (*Vang, supra*, 52 Cal.4th at p. 1044, citing Evid. Code, §§ 720, 801.)

In its offer of proof, the defense stated that Williams would have testified about the absence of photographic or other crime scene evidence, other than McElhinney's testimony, to prove the existence of the drag marks. This was relevant to the kidnapping and false imprisonment charges. It would have had some "tendency in reason to … disprove a[] disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

It cannot be said that Williams's proffered testimony " ' " 'would add *nothing at all* to the jury's common fund of information,' " ' " or that " ' " ' "the subject of inquiry is one of such common knowledge that [those with] ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*Brown, supra*, 59 Cal.4th at p. 101.) Williams's testimony would have been relevant to impeach the testimony of law enforcement about the drag marks and would have been relevant to assessing the credibility of McElhinney and Gregory on this point.

In arguing that there was no abuse of discretion here, the Attorney General relies on the fact that defendant thoroughly cross-examined McElhinney and Gregory. The Attorney General further emphasizes that the defense made use of the testimony revealed on cross-examination in closing arguments. However, these are matters more aptly addressed to prejudice than to whether the trial court abused its discretion in precluding the defense's expert witness. Cross-examination of prosecution witnesses is not a substitute for the presentation of relevant, qualified, and probative evidence from a defense expert.

Thus, the trial court abused its discretion in preventing the defense from presenting Williams's relevant testimony concerning the lack of drag marks.

**Prejudice**

Errors in excluding expert testimony are analyzed under the state law standard for prejudice in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Stoll* (1989) 49 Cal.3d 1136, 1163; accord *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 756.) "'[U]nder Watson, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) "[T]he Watson test for harmless error 'focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran*, at p. 956.)

27

As emphasized by the Attorney General, the defense thoroughly cross-examined McElhinney about her lack of experience and training and her actions at the crime scene. Through its cross-examination of McElhinney and Gregory, the defense laid bare the shortcomings in the processing and preservation of the crime scene. Through this crossexamination, the defense made clear to the jury that there was no photographic evidence showing drag marks, despite the fact that McElhinney insisted they were present at the crime scene and that the drag marks were depicted in photographs. It emphasized the absence of any evidence of drag marks other than law enforcement testimony.

As we have noted, Lefkowitz testified he saw defendant emerge from the bushes some 50 to 75 feet up the bike path from where he stopped his vehicle at the beginning of the bike path, and thereafter, saw Jane Doe emerge from the same bushes. Jane Doe was very disheveled, covered in dirt and leaves, her face was bloody, and her pants were down below her buttocks. Thus, it can be inferred from this evidence without Jane Doe's testimony that defendant forcibly moved Jane Doe into the bushes. Moving her even this short distance under the circumstances of this case, was sufficient to satisfy the asportation element of kidnapping. (*See* § 207; *People v. Gomez* (2018) 6 Cal.5th 243, 303-304 [discussing asportation element].) The movement increased the risk of harm to Jane Doe, as defendant moved her to a more secluded area, decreased the likelihood of detection for the same reason, " 'and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.' " (*Gomez*, at p. 304, quoting *People v. Martinez* (1999) 20 Cal.4th225, 237, overruled on another ground in *People v. Fontenot* (2019) 8 Cal.5th 57, 70.)

As for defendant's testimony, he never explained why Lefkowitz witnessed him emerging from the bushes so far up the bike path. Defendant did acknowledge he and Jane Doe walked from the sidewalk five to six feet up the bike path where they would be less readily observed by commuters going to work. He said he told Jane Doe to step over to a dirt area off of the bike path. Defendant insisted that, when he got the methamphetamine back from Jane Doe, they were still five or six feet from the East Avenue entrance to the bike trail. He testified that he took a couple of steps towards East Avenue, saw the police coming, turned around, and went north. That is when he tried unsuccessfully to ride away on his bike, which explained why the bike was farther north on the bike path from where he interacted with Jane Doe. However, given the actual distance up the bike path where Lefkowitz saw defendant and Jane Doe emerge from the bushes, the short distance defendant claimed they moved from the sidewalk, and Jane Doe's physical condition, the jury could have reasonably inferred defendant was not truthful about their movements and that defendant actually physically moved Jane Doe to the location where he was later seen emerging from the bushes by Lefkowitz.

Other than the alleged drag marks, this was not a case which depended heavily upon evidence recovered from the crime scene.

Rather, the location where defendant and Jane Doe were discovered, defendant's flight from the crime scene and then resisting arrest, and the DNA evidence were among the most significant components of the prosecution's case. We conclude that it is not reasonably probable that defendant would have obtained a more favorable result had Williams been permitted to testify about the lack of drag marks. (*Watson, supra*, 46 Cal.2d at p. 836.)

**Constitutional Claims and the Ineffective Assistance of Counsel**

The Attorney General asserts that defendant's constitutional claims are forfeited because he failed to raise them in the trial court.

In connection with Williams's proposed testimony, trial counsel did not make specific reference to the right to present a defense, the right to a fair trial, and the deprivation of due process. "An appellate contention that the erroneous admission or exclusion of evidence violated a constitutional right is not preserved in the absence of an objection on that ground below." (*People v. Daniels* (2009) 176 Cal.App.4th 304, 320, fn. 10 (*Daniels*), citing Evid. Code, §§ 353, 354.) "By failing to object below, defendant forfeited his claim that the exclusion of this evidence violated his constitutional rights . . . ." (*Daniels*, at p. 320, fn. 10.)

In his opening and reply briefs, defendant asserts that his trial attorneys were constitutionally ineffective for failing to raise the constitutional grounds he asserts on appeal. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washingto*n (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) "*The likelihood of a different result must be substantial*, not just conceivable." (*Richter*, at p. 112, italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75; *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10.)

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address

1
2
3
4
5

> both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland, supra*, 466 U.S. at p. 697.)

6
7
8
9
10

> Here, we turn directly to prejudice. The *Watson* standard for harmless error is substantially the same as the prejudice prong of *Strickland*. (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 (*Ocegueda*).) For all of the same reasons we discussed ante in our Watson analysis, we conclude that, even if defendant's trial attorneys' performance was deficient for failure to raise the constitutional grounds upon which he relies on appeal, he was not prejudiced as a result.

11    Lodged Doc. 22 at 33-38 (ECF No. 17-22 at 34-39).

12    
### D. Procedural Default and Related *Strickland* Analysis

13    The issued decided on the merits in state court was one of state law; the federal

14    constitutional claim was deemed forfeited by counsel's failure to object on constitutional grounds.

15    Respondent contends that the claim is therefore procedurally defaulted.  See Coleman, 501 U.S.

16    at 729 (1991).  The Ninth Circuit has squarely held that a California appellate court's forfeiture

17    finding based on the failure of trial counsel to preserve an issue supports procedural default under

18    Coleman and progeny.  Fairbank v. Ayers, 650 F.3d 1243, 1256-1257 (9th Cir. 2011).  Here as in

19    state court, petitioner attempts to excuse the default by alleging that counsel's failure to object

20    amounted to the ineffective assistance of counsel.  See ECF No. 1 at 49; see also Edwards, 529

21    U.S. at 451.  However, for the reasons explained by the California Court of Appeal, that argument

22    fails.

23    Even assuming that counsel's failure to "constitutionalize" the issue of Williams'

24    testimony was outside the bounds of reasonable attorney performance,[6] petitioner cannot meet the

25    Strickland prejudice standard.  Even without Williams' testimony, the jury had reason to doubt

26    

27    
28    

---

[6] This is a rather doubtful proposition, as the appellate court concluded that the testimony should have been admitted as a matter of state law, even without recourse to constitutional guarantees.  If a constitutional argument was unnecessary to achieve the goal of presenting the testimony, failure to make it cannot have been unreasonable.

1  McElhinney's testimony about the drag marks, which was not corroborated by the photographic

2  evidence, and to question the crime scene processing.  Moreover, there was ample circumstantial

3  evidence to support the kidnaping finding without reliance on, or even consideration of, drag

4  marks.  Accordingly, additional evidence disputing the reliability of the drag mark testimony

5  would not have had a likely effect on the verdict.[7]

6      III.    <u>Claim Four: Exclusion of Defense Expert Witness Northom</u>

7          A.  <u>Petitioner's Allegations and Pertinent State Court Record</u>

8         Petitioner contends that his rights were violated by the trial court's exclusion of proffered

9  expert testimony regarding the physical characteristics of crystal methamphetamine.

10         The California Court of Appeal summarized the pertinent trial court record as follows:[8]

> The defense sought to call Shon Northom, a criminal defense
> attorney, to testify concerning the physical characteristics of
> methamphetamine in response to the testimony of Hass, the
> prosecution's narcotics expert who testified in the prosecution
> rebuttal case.

> The prosecutor objected to Northom's proposed testimony,
> asserting that, while Northom was a defense attorney and
> previously was a deputy district attorney, he had no law
> enforcement experience. Thus, the prosecutor maintained the
> Northom was not an "appropriate expert witness in the subject."

> Defendant's trial counsel noted that Hass was expected to testify
> that methamphetamine shards are not sharp. Counsel asserted that
> Northom's experience was extensive. He was a criminal defense
> attorney. He handled cases involving methamphetamine and was
> very familiar with methamphetamine of all types. He was a
> Sacramento County district attorney for eight years, specifically
> handling cases involving methamphetamine in the narcotics unit.
> He also prosecuted methamphetamine cases in Tehama County. He
> provided monthly training to law enforcement concerning narcotics,
> and he attended the monthly narcotics "TAGME" meetings, "which

---

[7]  For the same reasons, Claim Three would fail even if this court bypassed the procedural default. Because the state court denied the constitutional claim on procedural grounds without a ruling on the merits, review in this court would be *de novo* under pre-AEDPA standards.  <u>See</u> <u>Cone v. Bell</u>, 556 U.S. 449, 472 (2009).  Under those standards, even if petitioner established that the exclusion of Williams' testimony infringed on his right to present a defense (or otherwise rose to the level of a constitutional violation), federal habeas relief would not be available unless he could also demonstrate that the error had a substantial and injurious effect on the verdict.  <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  When the trial record is considered in its totality, there is no likelihood of such prejudicial effect.

[8]  The undersigned finds this summary to be accurate.

are the same meetings on the CV of Detective Hass, which he only has 20 hours of and Mr. Northom has many more hours and much more experience than that."[fn. omitted.]   Northom had also prosecuted thousands of cases and handled hundreds more as a defense attorney. According to counsel, Northom was very familiar with methamphetamine and its appearance.

The prosecutor again objected to Northom's proposed testimony, asserting that he had no investigatory experience and no academic experience related to sales of narcotics. Trial counsel represented that Northom had extensive experience in training as well as prosecuting cases involving crystal methamphetamine. He had also handled it, had been involved in clandestine lab cases, and he had trained police officers. Counsel asserted that Northom had trained many police officers, "and he may have trained Detective Hass." Counsel then suggested an Evidence Code section 402 hearing. [fn. omitted.] Counsel further emphasized the limited nature of Northom's proposed surrebuttal testimony. He was only being offered to testify as to the "quality and nature and the substance itself, . . . the characteristics of the crystal methamphetamine . . . ." Northom's proposed testimony was limited to a description of the physical characteristics of crystal methamphetamine. Counsel further stated that Detective Hass was specifically asked, "whether or not he could get a puncture wound from crystal meth, from shards from glass, and he said no. Mr. Northom can say otherwise, from training and experience. And he has handled more meth I'm sure than him, and he has been part of many of the same things he has."

The court refused to allow Northom's testimony. The court was "not persuaded that Mr. Northom has the same expertise or greater of Detective Hass; also, that the narrow issue on which Northom is being proffered warrants the consumption of time in that what would need to be gone into so the jury could assign weight to his testimony would devolve into a trial on the expertise of Mr. Northom." (Italics added.) The court later continued: "The Court is ruling in light of the extensive cross-examination of Detective Hass by the defense; concerned under 352, the undue consumption of time to litigate the qualifications of Mr. Northom. The Court does see a distinction between Mr. Northom and his experience and Detective Hass, between a deputy district attorney and 20-year plus law enforcement officer who has worked with the task force in the capacity of investigating crimes rather than litigating them. And so the Court is going to preclude the witness." The court again repeated its opinion that allowing Northom to testify would result in undue litigation concerning Northom's qualifications, and that the consumption of time would outweigh the probative value of the evidence proffered.

After a recess, following an invitation by the court to do so, the defense came back with additional information. Trial counsel indicated that Northom had indeed worked on buy-bust operations, and had been the head of several of them. According to counsel, Northom had extensive experience running narcotics investigations. The court remained unpersuaded. The court seemed to suggest that

1    the defense's cross-examination of Hass was sufficient evidence on
     the subject for the jury's consideration.
2

3    Lodged Doc. 22 at 38-40 (ECF No. 17-22 at 39-41).

4         B.   The Clearly Established Federal Law

5         The U.S. Supreme Court precedent applicable to this claim is the same as that discussed in

6    relation to the previous claim.

7         C.   The State Court's Ruling

8    The California Court of Appeals ruled as follows:

9         The trial court was not persuaded as to Northom's experience as it
          related to the basis for his proffered testimony. However, we
10        conclude that the offer of proof established that Northom was
          sufficiently qualified to testify concerning the physical
11        characteristics of crystal methamphetamine. He had spent years as a
          narcotics prosecutor, and thereafter worked as a defense attorney, in
12        both roles participating in numerous cases involving
          methamphetamine. He taught educational programs concerning
13        narcotics to law enforcement. He was very familiar with
          methamphetamine and its appearance. He had handled crystal
14        methamphetamine, had been involved in clandestine lab cases, and
          supervised buy-bust operations and had experience running
15        narcotics investigations.

16        We conclude that, like Williams, Northom had " ' "special
          knowledge, skill, experience, training, or education" in a particular
17        field [so as] to qualify as an expert witness [citation] and to give
          testimony in the form of an opinion.' " (*Vang, supra*, 52 Cal.4th at
18        p. 1044, citing Evid. Code, §§ 720, 801.) To be sure, Northom's
          background, training and experience was different from that of
19        Hass, but it was more than sufficient to support the proffered
          testimony. Moreover, as asserted by defendant, " ' " "[w]here
20        witness has disclosed sufficient knowledge of the subject to entitle
          his opinion to go to the jury, the question of the degree of his
21        knowledge goes more to the weight of the evidence than to its
          admissibility.' " ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 536,
22        quoting *People v. Bolin* (1998) 18 Cal.4th 297, 321-322.)

23        Northom's very limited expert opinion was proffered as the "quality
          and nature and [methamphetamine] itself, . . . the characteristics of
24        the crystal methamphetamine . . . ." This is related to "a subject that
          is sufficiently beyond common experience that the opinion of an
25        expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)
          Moreover, this evidence was plainly relevant to a disputed fact of
26        consequence at defendant's trial. (Evid. Code, § 210.)

27        As with Williams's proffered testimony, it cannot be said that
          Northom's testimony " ' " 'would add nothing at all to the jury's
28        common fund of information,' " ' " or that " ' " ' "the subject of

33

inquiry is one of such common knowledge that [those with] ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*Brown, supra,* 59 Cal.4th at p. 101.)

The Attorney General asserts that the trial court was properly concerned with the undue consumption of time in litigating Northom's qualifications. We cannot agree that either the consideration of Northom's qualifications or the presentation of his substantive testimony would have consumed an undue amount of time within the meaning of Evidence Code section 352. The trial court was offered Northom's curriculum vitae. Based on the curriculum vitae, the offer of proof and the prosecution's opposition, it is clear that any time consumed examining Northom about his expertise would have been neither lengthy nor "undue." Indeed, there was simply only so much the prosecution could elicit in an effort to undermine the breadth of his experience.

The Attorney General further asserts that the court properly excluded Northom's testimony based on its limited probative value given the facts that the actual methamphetamine at issue was never recovered, and because Hass had already agreed that it was hypothetically possible for methamphetamine to puncture a plastic baggie. Again, we disagree. The evidence was relevant and highly probative of defendant's position that Jane Doe sustained the injuries to her throat from swallowing crystal methamphetamine. Moreover, Northom would essentially offer testimony diametrically opposed to that of Hass, leaving the jury to make its determination.

We conclude that the trial court abused its discretion in preventing the defense from presenting Northom's relevant and limited testimony.

**Prejudice**

Hass testified that he had never heard of anyone getting a cut by touching a methamphetamine shard. He acknowledged that crystal methamphetamine can have an appearance like shards of glass, although he further testified that, while it appears hard "you can break it." However, Hass also acknowledged on cross-examination that different people preparing methamphetamine attain different results, and while some may prepare methamphetamine that appears hard but is flaky, "other times it can be much harder." He also testified that, while he had not encountered methamphetamine that was hard enough to puncture a plastic baggie, he was not inclined to say that it could never happen.

The evidence established that Jane Doe sustained abrasions to the inside of her throat. She testified, albeit in sensational fashion, that defendant caused her injuries by putting his hands down her throat and pulling out scar tissue from inside her throat. An officer who collected swab samples from defendant testified that defendant's fingernails were "pretty long." The abrasion to Jane Doe's soft pallet towards the back of her mouth was consistent with having been inflicted by a fingernail. A DNA sample found underneath

34

defendant's left fingernails was from a female consistent with Jane Doe's profile.

In closing argument, addressing great bodily injury, trial counsel argued that defendant had not reached six or seven inches down Jane Doe's throat and cut her with his nails. Rather, according to counsel's arguments, it was more reasonable to conclude that defendant was simply trying to get his drugs back after Jane Doe swallowed them. Counsel argued that Jane Doe sustained injuries to her throat because, as the evidence established, she had a condition known as Barrett's esophagus which caused "previous problems with indigestion and GERD such that her throat had preexisting injury. She would be more subject to this type of an injury." Counsel further argued: "You heard testimony from [defendant] about this being glass. The type of methamphetamine it is. It is a very sharp. [sic] It is different than most methamphetamine, powder methamphetamine." Counsel emphasized that Hass had been shown photographs of methamphetamine in which the drug looked like shards of glass. Counsel argued that, while Hass testified that the methamphetamine looked sharp but could be easily crushed, the reality was that the shards of methamphetamine "can certainly poke through a bag, and they can certainly cause an injury to your throat." Counsel continued: "[t]hese are just many different forms of ice, of glass, some are thin shards, some are thick shards, some are big ones. For them to say there's no way that that injury was caused by this, is not consistent with what we know about crystal methamphetamine, and Officer Hass had to agree with."

Thus, the defense challenged Hass's testimony on the sharpness and solidity of crystal methamphetamine. Through cross-examination, the defense elicited an acknowledgement from Hass that some pieces of crystal methamphetamine can be much harder than other pieces. The defense also elicited testimony from Hass that, theoretically, crystal methamphetamine could pierce a plastic bag. The defense also argued that Jane Doe sustained her injuries not from defendant putting his fingers far down her throat, but instead from the sharp methamphetamine, either when she swallowed it or when defendant caused her to gag it back up.

Furthermore, Northom's testimony would not have addressed any other injury sustained by Jane Doe such as the injury she sustained from hitting her head on the pavement.

Given the jury's rejection of the sexual assault charges, and the lack of an apparent reason for sticking one's hand into someone's mouth other than the reason defendant testified about, we conclude that it is not reasonably probable that defendant would have obtained a more favorable result had the trial court not precluded Northom's testimony about the physical characteristics of crystal methamphetamine and the aspects of Hass's testimony with which he disagreed. (*Watson, supra*, 46 Cal.2d at p. 836.) The jury's verdicts and great bodily injury findings were consistent with defendant's own testimony.

**Constitutional Claims and the Ineffective Assistance of Counsel**

> As he did with regard to the exclusion of Williams's proffered testimony, defendant asserts that his trial counsel were ineffective for failing to argue the applicable constitutional grounds with regard to the exclusion of Northom's testimony. Specifically, he asserts that his trial attorneys were constitutionally ineffective for failing to argue that the court's ruling denied him a meaningful opportunity to present a defense on the great bodily injury enhancement, and deprived him of his rights to due process and a fair trial.

> Again, by "failing to object below, defendant forfeited his claim that the exclusion of this evidence violated his constitutional rights . . . ." (*Daniels, supra*, 176 Cal.App.4th at p. 320, fn. 10.)

> We turn directly to prejudice once again. (*See Strickland, supra*, 466 U.S. at p. 697.) And again, we note that the *Watson* standard for harmless error is substantially the same as the prejudice prong of *Strickland*. (*Ocegueda, supra*, 247 Cal.App.4th at p. 1407, fn. 4.) For the same reasons we discussed in our *Watson* analysis in this Discussion part, we conclude that, even if defendant's trial attorneys' performance was deficient for failure to raise the constitutional grounds upon which he relies on appeal, he was not prejudiced as a result.

Lodged Doc. 22 at 41-46 (ECF No. 17-22 at 42-47).

     D.  Procedural Default and Related *Strickland* Analysis

As it did in relation to the previous claim, the California Court of Appeal found as a matter of state law that the proffered expert testimony had been excluded in error but that the error had been harmless; the constitutional claim was found to have been forfeited. As with the previous claim, the state court conducted Strickland analysis in response to petitioner's assertion of ineffective assistance of counsel in failing to preserve the issue. And as with the previous claim, the undersigned concludes that the claim is defaulted and cannot be resuscitated by petitioner's IAC allegations due to lack of prejudice.

The state court's finding of forfeiture deprives this court of authority to consider petitioner's claim absent a showing of cause and prejudice. See Fairbank, 650 F.3d at 1256-1257. Counsel's allegedly unreasonable failure to make a constitutional argument in the trial court cannot meet that standard, for the reasons explained by the state court. Northom's testimony may have supported petitioner's theory as to the abrasions in Jane Doe's throat, but in light of the

DNA under petitioner's fingernails and his own testimony that he reached into her mouth to retrieve his drugs, there is no likelihood of a different result had Northom been permitted to testify about the sharpness of crystal meth.  Accordingly, petitioner's cause and prejudice showing fails.[9]

IV.   Claim Five: Limitations on Cross-Examination of Victim

A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that his rights were violated by limitations placed on his cross-examination of Jane Doe regarding her mental health history, intended to impeach her testimonial reliability.

The pertinent trial court record was summarized as follows by the California Court of Appeal:[10]

> In anticipation of Jane Doe's testimony, the prosecutor moved in limine to establish the extent the defense would be permitted to cross-examine her about her criminal and mental health history. The prosecutor noted that there was a report documenting a call on April 27, 2017, more than 14 months after the charged incident, in which Detective Gregory informed dispatch that he would be taking Jane Doe to a mental health facility. The prosecutor objected to any questioning about that incident and any reference to mental or behavioral health treatment.
>
> Defendant's trial counsel asserted that "we have that interview . . . wherein she was [Welfare and Institutions Code section] 5150. That is highly relevant to the defense's case to her credibility insofar as it describes her mental health state during that period . . . ." Trial counsel asserted that Jane Doe made statements during that interview "about this particular incident that are very inconsistent with her other statements. So it goes toward her credibility and to impeachment. And it definitely goes toward, in addition, her mental health issues."
>
> Subsequently, the prosecutor reiterated his request to have any evidence concerning Jane Doe's psychological history excluded. The prosecutor stated that he was moving to exclude evidence "of any kind of behavior other than the felony conviction" pursuant to Evidence Code sections 352, 786, and 788. The prosecutor further stated that Jane Doe was invoking the psychotherapist-patient privilege.

---

[9] For the same reasons, Claim Four would fail the prejudice standard applicable under Brecht, supra, if this court bypassed the procedural default and reached the merits.

[10] The undersigned finds this summary to be accurate.

Trial counsel disputed whether the privilege applied, asserting that at issue were not matters derived from Jane Doe's relationship with any mental health professional. Counsel noted that Jane Doe had been diagnosed with and treated for serious mental illness. And counsel emphasized the occasion when Jane Doe "was 5150," she talked about the charges, and she "specifically says . . . there was one more there . . . than one dude when I was on the path that night, . . . and I know that they raped me really bad, and that they choked me until I was dead and for a short time but I know that it was a lot worse than I thought." Counsel asserted that these matters went directly to Jane Doe's credibility, the most crucial issue in the case. Further, counsel emphasized that the jury remained unaware of Jane Doe's mental health issues and that those issues affected her ability to perceive reality and to recall events accurately. Counsel asserted that prohibiting the defense from cross-examining Jane Doe on these matters violated due process and defendant's Sixth Amendment rights to confront and cross-examine witnesses against him. Counsel further asserted that the prosecution's contention that the evidence should be excluded pursuant to Evidence Code section 352 was "silly" given the importance of the evidence and defendant's potential exposure. Additionally, counsel noted that, among the considerations relevant to witness credibility set forth in Evidence Code section 780 is the "extent of [the witness's] capacity to perceive, to recollect, or to communicate any matter about which" the witness testifies. (Evid. Code, § 780, subd.(c).)

The trial court ruled that it would "deny the use of any mental health or behavioral health information or incident effectively sustaining the objection on the claim of the psychotherapist-patient privilege." The court stated that "statements attributed to Jane Doe are said to be in the context of emotional distress . . . to the degree of that distress that Jane Doe sought treatment through behavioral health. The statements made in that context, in the Court's mind, are unreliable." The court further stated that no evidence suggested that Jane Doe was "in any similar state during the time that this crime occurred. There's been no evidence that the Court has heard yet that Jane Doe was in a persistent delusional state or detached from reality at the time of the crime." Additionally, the court stated that nothing it had heard suggested that Jane Doe was unable to perceive or recall events due to her mental condition. The court did not see any correlation between Jane Doe's mental health history and statements she made at the time of treatment and her credibility.

Trial counsel asserted that Jane Doe's statement to Gregory, that she was raped by multiple people was (1) not made to a mental health professional but to a law enforcement officer, and (2) directly in conflict with her trial testimony. Counsel argued, "if nothing else, we should be able to just state, you were interviewed on that date, and on that date she said that there was more than one dude who was on the path that night, and that they raped me." The trial court stated: "[t]hat was on the heels of seeking treatment. The Court's finding that statements made in that context are unreliable, so the Court is not going to allow questioning in that area."

38

1    Lodged Doc. 22 at 17-20 (ECF No. 17-22 at 18-21).

2           B.   The Clearly Established Federal Law

3           The Confrontation Clause of the Sixth Amendment guarantees the right to cross-examine

4    prosecution witnesses.  Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam); Pointer v.

5    Texas, 380 U.S. 400, 403-405 (1965).  However, cross-examination may be limited to

6    accommodate other legitimate interests in the criminal trial process.  Rock v. Arkansas, 483 U.S.

7    44, 55 (1987).  Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause

8    is concerned to impose reasonable limits on such cross-examinations based on concerns about,

9    among other things, harassment, prejudice, confusion of the issues, the witness' safety, or

10   interrogation that is repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S.

11   673, 679 (1986).  "Subject always to the broad discretion of a trial judge to preclude repetitive

12   and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the

13   witness' story to test the witness' perceptions and memory, but the cross-examiner has

14   traditionally been allowed to impeach, i.e., discredit, the witness."  Davis v. Alaska, 415 U.S.

15   308, 316 (1974).

16           C.   The State Court's Ruling

17           The court of appeal first set forth the law governing the claim, beginning with applicable

18   California rules of evidence and including the federal constitutional principles that apply to limits

19   on cross-examination.  Lodged Doc. 22 at 21-23 (ECF No. 17-22 at 22-24) (citing, *inter alia*,

20   Pointer, Van Arsdall, and Davis).  The court then analyzed the claim as follow:

21           **1. Statements Jane Doe Made to Gregory on April 27, 2017**

22           Defendant's trial counsel argued that, on April 27, 2017, when Jane
23   Doe "was 5150," she talked about the charged events with Gregory
     and she "specifically says . . . there was one more . . . dude when I
24   was on the path that night, . . . and I know that they raped me really
     bad, and that they choked me until I was dead and for a short time
25   but I know that it was a lot worse than I thought." Separate from
     evidence of the Welfare and Institutions Code section 5150
26   commitment, Jane Doe's statement to Gregory was relevant, as it
     directly addressed the circumstances surrounding the charged
27   offenses and was inconsistent with other statements she made and
     her trial testimony. Thus, it was "evidence that was relevant to the
28   credibility of a witness" and had a tendency in reason to prove or
     disprove a "disputed fact that is of consequence to the

39

determination of the action." (Evid. Code, § 210.) Thus, contrary to the Attorney General's contention, these statements were relevant.

Further, to the extent that the prosecutor objected to the admission of the statements on Evidence Code section 352 grounds, and to the extent the trial court considered such grounds in precluding the evidence, we conclude that this was an abuse of discretion. The probative value of the statements was high. They were statements Jane Doe made concerning the occurrence of the charged offenses that were inconsistent with her trial testimony and earlier statements she made to the police. And the probative value of these statements relative to Jane Doe's credibility was enhanced by their contents: her assertion that she was attacked by multiple people, choked, raped "really bad," and almost killed. We conclude that this probative value was not substantially outweighed by the risk that admission of the statements, or cross-examination of Jane Doe about them, would necessitate undue consumption of time. (Evid. Code, § 352.) The evidence would have been admitted through Gregory, and it would take him very little time to relay the brief statements summarized ante. Moreover, the significant probative value of this evidence would not have been substantially outweighed by the probability that its admission would "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid.*) The evidence of these statements would neither confuse the issues nor mislead the jury; on the contrary, it would give the jury more information about defendant's accuser, her credibility, and her account of the charged offenses. Further, we cannot conclude that the probative value of this evidence to defendant's case would have been substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice to Jane Doe. Indeed, the People have not cited any authority to support a contention that the prejudice concern in Evidence Code section 352 extends to a prosecution witness. Additionally, we note that the trial court's determination that these statements should not be admitted based on its determination that they were unreliable is not supported in the law. Reliability is not an Evidence Code section 352 counterweight. Nor is reliability required before prior inconsistent statements can be admitted for purposes of credibility. [fn. omitted.]

Indeed, the People have not cited any statute or case that supports the exclusion of this evidence on the basis relied upon by the trial court. Instead, on appeal, the People rebrand the rationale of the trial court's ruling, contending that "even if statements Doe made during the mental health crisis could be deemed relevant, the trial court reasonably excluded the evidence under Evidence Code section 352. Any statements Doe made in the midst of a mental-health crisis more than a year after the events in question lacked credibility and provided minimal probative value of what had actually occurred in 2016." But the defense never offered these statements for the truth of the matter. Instead, they offered them precisely because they lacked credibility and because they were inconsistent with other statements Jane Doe had made. If the prosecution desired to introduce the circumstances under which the statements were made, it would have been up to them to do so.

40

Neither the statements, nor the circumstances under which they were made implicated the psychotherapist-patient privilege. [fn. omitted.]

Thus, we conclude the trial court abused its discretion in precluding Jane Doe's April 27, 2017, statements to Gregory or cross-examination of Jane Doe about them. We address prejudice *post*.

**2. Jane Doe's Mental and Emotional State on April 27, 2017**

Conversely, we conclude that the trial court did not abuse its discretion in precluding the defense from establishing Jane Doe's mental and emotional state as of April 27, 2017. Jane Doe's mental and emotional state more than 14 months after her encounter with defendant were not relevant to the defendant's defense. (Evid. Code, § 210.) Defendant did not establish any connection between Jane Doe's mental and emotional state on February 17, 2016, the day of the incident, and her mental and emotional state on April 27, 2017, the day she was apparently committed under Welfare and Institutions Code section 5150. Thus, the evidence was not relevant to Jane Doe's mental and emotional state at the time of the charged offenses. Additionally, defendant established no connection to Jane Doe's testimony, more than five months later. Consequently, the evidence was not relevant to the credibility of her trial testimony. Accordingly, we conclude that the trial court did not abuse its discretion in precluding this evidence.

Defendant relies on *Gurule*, *supra*, 28 Cal.4th 557, asserting that it is similar to the circumstances of this case and is controlling. However, the issue decided in *Gurule* is not the same as here. In *Gurule*, our high court considered the pretrial discovery of the psychiatric records of a codefendant turned prosecution witness. (*Id.* at pp. 587-595.) Here, we address the preclusion at trial of evidence concerning a victim's mental and emotional state more than 14 months after the charged offenses and more than five months before trial. *Gurule* is authority for the proposition that "the mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*Gurule*, at pp. 591-592, italics added.) However, defendant has not established that the mental or emotional instability of Jane Doe on April 27, 2017, was potentially relevant to her credibility at trial. Nor has he established any relevance of her mental state on that date to her ability to perceive, recall or describe the events in question, either on February 17, 2016, when the charged offenses occurred, or when she testified at trial in October 2017. [fn. omitted.]

We conclude that the trial court did not abuse its discretion in precluding the cross-examination of Jane Doe on matters related to her mental and emotional state on April 27, 2017.

**Prejudice Regarding Exclusion of the April 27, 2017 Statements**

Defendant asserts that an analysis of whether he was prejudiced by

41

1   the trial court's error in precluding the subject evidence must be
    considered under the harmless-beyond-a-reasonable-doubt standard
2   in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705]
    (*Chapman*), because the error infringed on his constitutional rights
3   under the Fifth, Sixth, and Fourteenth Amendments. Since
    *Chapman*, our high court has " 'repeatedly reaffirmed the principle
4   that an otherwise valid conviction should not be set aside if the
    reviewing court may confidently say, on the whole record, that the
5   constitutional error was harmless beyond a reasonable doubt.' "
    (*People v. Geier* (2007) 41 Cal.4th 555, 608; accord, *People v.*
6   *Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*).) "The harmless error
    inquiry asks: 'Is it clear beyond a reasonable doubt that a rational
7   jury would have found the defendant guilty absent the error?' "
    (*Geier*, at p. 608; *People v. Livingston* (2012) 53 Cal.4th 1145,
8   1159.) To determine whether the People have satisfied their burden
    of proving the error was harmless beyond a reasonable doubt, "we
9   examine the entire record and must reverse if there is a ' "
    'reasonable possibility' " ' that the error contributed to the verdict."
10  (*People v. Reese* (2017) 2 Cal.5th 660, 671 (*Reese*), citing *People v.*
    *Aranda* (2012) 55 Cal.4th 342, 367 (*Aranda*).)  The Attorney
11  General counters that the error was harmless under any standard.

12  We conclude that the error in precluding Jane Doe's statements to
    Gregory on April 27, 2017, was, indeed, harmless even under
13  *Chapman*. Notwithstanding the preclusion of the prior inconsistent
    statements to Gregory on April 27, 2017, the defense was permitted
14  to cross-examine Jane Doe thoroughly. Through its cross-
    examination, the defense explored inconsistencies in her account of
15  the incident. The parties also entered into the stipulation which
    contained matters inconsistent with Jane Doe's trial account. The
16  defense also cross-examined Jane Doe about her criminal history
    and her drug use. The jury had the opportunity to watch Jane Doe's
17  testimony, observe her demeanor, and assess her credibility. The
    defense presented the testimony of Imogean Dodson, who testified
18  about Jane Doe breaking into her house, stealing from her, and
    expressing the obviously mistaken belief she lived in the Dodson
19  house. Imogean also testified that she did not believe Jane Doe was
    truthful. Introduction of evidence concerning Jane Doe's mental
20  state when she made the inconsistent statements to Gregory on
    April 17, 2017, ultimately may have harmed defendant's defense
21  because a jury could have inferred her mental state on that day
    resulted from the trauma of what happened on the night of the
22  charged offenses.

23  In any event, the jury found defendant not guilty of both kidnapping
    to commit rape and assault to commit rape. Thus, the jury rejected
24  Jane Doe's testimony that she had been the victim of sexual assault.
    Instead, the jury found defendant guilty of simple assault and that
25  finding was consistent with defendant's own version of the incident
    indicating that he reached down Jane Doe's throat to make her gag
26  his methamphetamine back up. As for the kidnapping and false
    imprisonment, those lesser offenses were supported by Lefkowitz's
27  testimony. Lefkowitz testified that he saw defendant emerge from
    the bushes 50 to 75 feet up the bike path from where Lefkowitz
28  initially parked upon driving onto the entrance of the bike path.

1

2

3

> Shortly thereafter, he saw Jane Doe emerge from the shrubs in the same area where he had seen defendant. Therefore, the preclusion of Jane Doe's inconsistent account to Gregory on April 27, 2017, as to how the sexual assault occurred was without consequence.

4

5

6

7

> Based on the foregoing, we conclude that the error in precluding Jane Doe's statements to Gregory on April 27, 2017, was harmless beyond a reasonable doubt. There is no " ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*Reese, supra*, 2 Cal.5th at p. 671; *Aranda, supra*, 55 Cal.4th at p. 367; *see Chapman, supra*, 386 U.S. at p. 24; *Aledamat*, supra, 8 Cal.5th at p. 3.)

8

Lodged Doc. 22 at 23-29 (EC No. 17-22 at 24-30).

9

   D.   Objective Reasonableness Under § 2254(d)

10

      1.   Statements Made by Jane Doe on April 27, 2017

11

The state court found that the statements Jane Doe made on April 27, 2017 about the

12

charged events were excluded in error, but that the error was harmless beyond a reasonable doubt.

13

It is therefore the state court's application of Chapman v. California, supra, that is the subject of

14

reasonableness review under § 2254(d).  See Mitchell v. Esparza, 540 U.S. 12, 17-18 (2003) (per

15

curiam) (when state court denies a constitutional claim on harmless error grounds, the question on

16

review under AEDPA is the reasonableness of the harmless error determination).  This court must

17

defer to the court of appeal's harmless error determination unless it was in conflict with the

18

reasoning or the holdings of Supreme Court precedent, or if it applied harmless error review in an

19

objectively unreasonable manner.  Inthavong v. Lamarque, 420 F.3d 1055, 1058-59 (9th Cir.

20

2005), cert. denied, 547 U.S. 1059 (2006).

21

Here, the state court applied the correct standard for the harmlessness of constitutional

22

error, and that application was not objectively unreasonable.  The jury was presented with many

23

reasons to be skeptical of Jane Doe's testimony, including her criminal history, drug use, and

24

prior inconsistent statements.  Her testimony included statements that may well have struck jurors

25

as exaggerated or fantastical, for example that petitioner had pulled chunks of her neck out of her

26

throat and thrown them on the ground.[11]  Jane Doe was thoroughly cross-examined, and the

27

28

[11]  Similarly, Dr. Ward testified that when Jane Doe was at the hospital, she reported that a man had tried to reach down her throat and pull out her guts.

1   reliability of her account was challenged.  A witness who had known her for many years testified

2   that she was untruthful.  Accordingly, it is unlikely that that admission of the April 27, 2017

3   statements would have changed the credibility calculus so significantly as to bring about a

4   different result.  To the contrary, it is apparent from the jury's rejection of the sexual assault

5   charges that they disbelieved the very portions of Jane Doe's testimony with which the April 27,

6   2017 statements were inconsistent.  The lesser included counts of conviction, which did not

7   involve intent to commit a sex crime, were supported by evidence independent of Jane Doe's

8   testimony.  On this record, it was perfectly reasonable of the state court to conclude that exclusion

9   of the statements was harmless beyond a reasonable doubt.

10                    2.   Jane Doe's Mental State on April 27, 2017

11          The state court found that Jane Doe's mental state on April 27, 2017, was not admissible

12   as a matter of California law.  Assuming a silent rejection of the constitutional dimension of the

13   claim, which had been preserved below and argued on appeal,[12] the question under § 2254(d) is

14   whether the outcome is objectively unreasonable under clearly established federal law.  See

15   Richter, 562 U.S. at 102.  Supreme Court precedent recognizes that cross-examination may be

16   limited to prevent "harassment, prejudice, confusion of the issues, the witness' safety, or

17   interrogation that is repetitive or only marginally relevant."  Van Arsdall, 475 U.S. at 679.

18   Inquiry into a complaining witness's mental health crisis on a date unrelated to the charged events

19   and at chronological remove from her testimony could reasonably be considered harassing or

20   prejudicial.  It certainly involves sensitive personal information in which the witness has a strong

21   privacy interest.  While Jane Doe's mental state at the time of the charged conduct or at the time

22   of the trial may well have been relevant to the reliability of her testimony, her mental state on a

23   different occasion altogether was not.  Accordingly, it was reasonable for the state court to

24   conclude that this limitation on cross-examination was constitutionally permissible.  Because the

25   state court's decision involved no unreasonable application of federal law, relief is unavailable.

26   ////

27   _____

28   [12] As noted above, the appellate court recited the applicable principles of federal constitutional
     law prior to its discussion of the claim.

1    V.      Claim Six: Cumulative Error

2            A.    Petitioner's Allegations and Pertinent State Court Record

3        Petitioner alleges that he is entitled to relief because he cumulative effects of the alleged

4    errors violated his right to a fair trial.

5            B.    The Clearly Established Federal Law

6        The combined effect of multiple trial court errors violates due process when it renders the

7    resulting criminal trial fundamentally unfair.    Chambers v. Mississippi, 410 U.S. 284, 298 (1973).

8    The cumulative effect of multiple errors can violate due process even when no single error rises

9    to the level of a constitutional violation.    Id. at 290 n.3.

10           C.    The State Court's Ruling

11       The California Court of Appeal ruled as follows:

12               Defendant asserts that the cumulative effect of the errors he alleges
                 prejudiced him, mandating reversal. We reject this contention. The
13               premise behind the cumulative error doctrine is that, while a
                 number of errors may be harmless taken individually, their
14               cumulative effect requires reversal. (People v. Bunyard (1988) 45
                 Cal.3d 1189, 1236- 1237, disapproved on another ground in People
15               v. Diaz (2015) 60 Cal.4th 1176.) Any of the potential errors
                 identified above "were harmless, whether considered individually
16               or collectively. Defendant was entitled to a fair trial but not a
                 perfect one." (People v. Cunningham (2001) 25 Cal.4th 926, 1009.)
17               We have found no prejudice when considering defendant's claims
                 separately. Viewed cumulatively, our conclusion is the same.
18               Defendant was not deprived of a fair trial.

19   Lodged Doc. 22 at 60-61 (ECF NO. 17-22 at 61-62).

20           D.    Objective Reasonableness Under § 2254(d)

21       The state court did not expressly recite the federal due process standard, but its conclusion

22   that petitioner was not deprived of a fair trial demonstrates that it conducted the required inquiry.

23   Although there were several errors at petitioner's trial, the undersigned agrees that none of them

24   individually or in combination with others created fundamental unfairness.  The most serious

25   errors identified above were limited in their likely effects to the sexual assault theory of the case,

26   which the jury resolved in petitioner's favor despite the errors.  On the closely related issue of

27   Jane Doe's credibility, the jury's rejection of the sexual assault theory demonstrates that that they

28   did not find her entirely credible.  As noted repeatedly above, the fundamental fairness of the

1   credibility contest at the heart of petitioner's trial is illustrated by the defense's extensive

2   impeachment of Jane Doe and presentation of exculpatory character evidence regarding

3   petitioner, and by the jury's opportunity to observe them both and make independent credibility

4   determinations.

5          The other errors at petitioner's trial went to relatively tangential matters (the comment

6   about the search warrant and exclusion of expert testimony about the drag mark evidence) or had

7   little likely impact for the reasons already explained.  Accordingly, even when the likely effect of

8   all identified errors is considered collectively, it was not unreasonable of the state court to find no

9   fundamental unfairness.  <u>See</u> <u>Ybarra v. McDaniel</u>, 656 F.3d 984, 1001 (9th Cir. 2011) (petitioner

10  not entitled to relief for cumulative error where trial imperfections do not infect trial with

11  unfairness in violation of due process).

12                                         <u>CONCLUSION</u>

13         For all the reasons explained above, the state courts' denial of petitioner's claims was not

14  objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  [Even without reference to

15  AEDPA standards, petitioner has not established any violation of his constitutional rights.]

16  Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be

17  denied.

18         These findings and recommendations are submitted to the United States District Judge

19  assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

20  after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

23  he shall also address whether a certificate of appealability should issue and, if so, why and as to

24  which issues.  <u>See</u> 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

25  within fourteen days after service of the objections.  The parties are advised that failure to file

26  ////

27  ////

28  ////

objections within the specified time may waive the right to appeal the District Court's order.

Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 16, 2023

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE